UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                                  :
RALPH SANZARI, *in his capacity as general Chairman* :
*of the Association of Commuter Rail Employees, Division* :
*I*,                                                              :
                                                                  :
                                        Plaintiff,                :
                                                                  :
                     -v-                                          :
                                                                  :
METRO-NORTH RAILROAD COMPANY,                                     :
                                                                  :
                                        Defendant.              X
                                                                  
-------------------------------------------------------------------

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____           │
│ DATE FILED:__2/9/2021__          │
└─────────────────────────────────┘
```

19-cv-8689 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendant Metro-North Railroad Company ("MNR" or "Defendant") moves pursuant to Federal Rules of Civil Procedure 12(b)(1) & (6) to dismiss the Amended Complaint, at Dkt. No. 10 ("AC" or "Complaint") filed by Plaintiff Ralph Sanzari ("Sanzari" or "Plaintiff"), on the grounds that the Court lacks subject matter jurisdiction and the Complaint fails to state a claim upon which relief may be granted.

## BACKGROUND

### A.    Parties

Plaintiff Sanzari brings this suit in his capacity as General Chairman of the Association of Commuter Rail Employees, Division 1 ("ACRE 1"). ACRE 1 is a voluntary unincorporated association formed under the laws of the State of New York. AC ¶ 5.

MNR is a company that operates railroad-related facilities in this district and that is engaged in the transportation of passengers by rail in interstate commerce. AC ¶¶ 7-8. It is a "carrier" as defined by the Railway Labor Act ("RLA"). *Id*. ¶ 8; 45 U.S.C. § 151 (First). Since the year 2000, ACRE 1 has been the duly authorized bargaining representative, pursuant to the

RLA, for conductors, yardmasters, assistant yardmasters, and stationmasters employed by MNR. AC ¶¶ 5, 9; 45 U.S.C. § 151 (Sixth).

ACRE 1 and MNR are parties to two collective bargaining agreements relevant to this action: one that governs terms and conditions of employment for MNR conductors and assistant conductors (the "Conductor CBA"), and one that governs the terms and conditions of employment for MNR yardmasters, assistant yardmasters, and stationmasters (the "Yardmaster CBA") (together with the Conductor CBA, "CBAs").  AC ¶¶ 10-11.  The CBAs are governed by the RLA which, as discussed in more detail below, governs labor relations in transportation industries including railroads.  The Conductor CBA became amendable pursuant to the terms of the RLA on September 1, 2019.  AC ¶ 10.  The Yardmaster CBA became amendable pursuant to the terms of the RLA on January 15, 2017.  AC ¶ 11.  ACRE 1 and MNR have been engaged in bargaining for a successor agreement to the Yardmaster CBA since that CBA became amendable but ACRE 1 and MNR have not yet completed negotiations.  AC ¶ 12.

> **B.**      **The disputed time management system**

The dispute in this case arises out of an effort by MNR and its parent company, the Metropolitan Transportation Authority ("MTA"), to implement a new standardized time and attendance recording system, the Kronos Biomentric and Attendance System ("Kronos").  Kronos is a timekeeping system that will be used to verify the start and end time of each employees' shift.  AC ¶ 17.

MNR currently uses a system called the Crew Management System ("CMS") to verify an employee's attendance at work and to record that time for purposes of payroll.  AC ¶ 14.  CMS was adopted in 1999, after negotiations between MNR and MNR employee unions that preceded ACRE 1 and was memorialized in letter agreements (including two letters, of January 30, 1998, at Dkt. No. 23-5 ("1998 Letter") and January 13, 1999, at Dkt. No. 23-6 ("1999 Letter") sent by

MNR representatives to yardmaster and conductor union representatives.  AC ¶ 14.  Prior to the

adoption of CMS, MNR conductors used physical timeslips to record their time and attendance,

which the MNR payroll department then used to process the conductors' compensation.  Dkt.

No. 27 ("Bottalico Aff.") ¶ 9.

CMS is a time clock system that uses identification cards; conductors swipe their

identification card at the start of their tour of duty, and log in and key in to the CMS system to

verify their attendance.  *Id.* ¶ 15.  Pursuant to CMS, and as memorialized in the 1998 Letter,

conductors are permitted to either swipe out at the end of their shift or to confirm during the

subsequent swipe-in process that they completed their previous assignment—they are not

required to swipe out of the CMS system at the end of their tour of duty.  AC ¶ 15; 1998 Letter.

The letters memorializing the CMS system do not establish any disciplinary measures associated

with a late or missed swipe-in or swipe-out.  AC ¶ 16; 1998 Letter; 1999 Letter.

By letter dated May 17, 2019, MNR's parent company, the Metropolitan Transportation

Authority ("MTA") notified ACRE 1 that it was seeking to implement a new standardized time

and attendance recording system that would modify CMS, the Kronos Biometric Time and

Attendance System ("Kronos").  When this litigation was commenced, Plaintiff challenged the

element of the proposed Kronos system that would require employees to scan their fingerprint, as

opposed to or in addition to using a swipe card, in order to document the start and end of each

shift.  While this case was pending, MNR decided to unilaterally suspend implementation of the

fingerprint scanning system that was originally announced to be a part of the Kronos system.  At

oral argument Plaintiffs withdrew their objection to the proposed fingerprint scanning policy as a

basis for their claims in this case due to the indefinite suspension of that policy.  Accordingly, at

present, MNR still requires employees to swipe a card to log their time.  The only changes to

CMS that Plaintiff is challenging by this action are requirements that employees swipe out at the end of each shift (as opposed to giving them the additional option of swiping out at the beginning of the next shift), and the possibility that discipline will be imposed for failure to abide by the timekeeping policy.

In a May 17, 2019 letter, Anita L. Miller, the Chief Employee Relations and Administrative Officer the MTA notified ACRE 1 that the MTA would "in the very near future, begin expanding the use of Kronos biometric timeclocks to all reporting locations throughout the MTA Agencies," and that the devices would "replace or upgrade existing Kronos timeclocks" for those employees that already use Kronos, which at the time of the letter included yardmasters and stationmasters, but "[i]n those locations that do not currently use Kronos," which included stations for conductors and assistant conductors, "we will be migrating employees to a Kronos platform." AC ¶ 18. Miller advised that "prior to implementation, I have asked each agency to meet with their corresponding union representatives to provide additional information and to hear your concerns." *Id*. ACRE 1 alleges that since that date MNR has been threatening to unilaterally implement the Kronos system and to require full use of it by ACRE 1 employees despite ACRE 1's repeated requests to bargain with regard to its implementation. AC ¶ 18.

The Amended Complaint, and the materials submitted in connection with the current motion, document ACRE 1's objections to the Kronos system and the extensive back-and-forth to date between ACRE 1 and MNR regarding the implementation of Kronos.

On June 11, 2019, ACRE 1 filed a complaint with the New York State Department of Labor ("DOL") alleging that MNR's adoption of the Kronos system would violate New York Labor Law Section 201-a, which prohibits employers from requiring employees to be fingerprinted as a condition of securing or continuing employment. AC ¶ 19.

MNR and ACRE 1 met on or about July 23, 2019 to discuss the implementation of Kronos.  *Id*. ¶ 20.

By letter dated August 9, 2019, ACRE 1 notified MNR of its complaint to DOL and indicated that ACRE 1 was willing to enter into negotiations regarding Kronos.  The letter requested that any attempts by MNR to mandate enrollment into the Kronos system be postponed until either the DOL issued a response to ACRE 1's complaint or an agreement was reached between ACRE 1 and MNR through negotiations.  *Id*. ¶ 21.

Andrew J. Paul ("Paul"), MNR's Vice President of Labor Relations sent a letter to ACRE 1 on August 12, 2019.  Paul's letter, which did not address ACRE 1's letter, notified ACRE 1 that the Kronos system "will be used by all MTA employees, both represented and non-represented, and each employee will be required to adhere to all enrollment requirements and use the new biometric timeclocks when implementation commences."  *Id*. ¶ 22.  The letter went on to state that "employee enrollment . . . will require a scan of two (2) fingers," and that "[o]nce employees have registered their finger scans, they will be required to first swipe their Metro-North ID Pass, and then scan their finger on the Kronos clock scanner when swiping in and out each working day."  *Id*.  The letter stated that "[f]or your membership, employees will be required to use the new Kronos biometric clocks in addition to the Crew Management System," and reiterated that "[a]ll employees must swipe in at the beginning of the tour of duty, and out at the end of their tour of duty."  *Id*.  The letter acknowledged that "there were some questions and concerns raised with respect to the new technology and the nature of the biometric scan of employees' fingers," but stated "[MNR] believe[s] this technology is consistent with prevailing state and federal laws," and "[a]s such, we are still moving forward with this initiative as planned."  *Id*.

On August 27, 2019, MNR notified ACRE 1 that Conductors would be required to swipe in at the beginning and end of each shift on the Kronos system beginning September 4, 2019, and that "biometric enrollment" would begin soon thereafter.  *Id.* ¶ 23.

In the meantime, as the Conductor CBA was set to expire on September 1, 2019, on August 29, 2019 ACRE 1 sent a notice to MNR pursuant to the RLA purporting to trigger MNR's duty to bargain with regard to the Conductors.  *Id.* ¶ 24.

Paul sent a subsequent letter to ACRE 1 on August 30, 2019.  *Id.* ¶ 27.  In it, Paul stated that he had not received the August 9, 2019 letter from ACRE 1 before he drafted his August 12, 2019 letter.  However, he reiterated that MTA and MRN were "continuing with implementation of employees' use of the Kronos Upgrade as planned," and that "commencing September 4, 2019, Conductors must swipe in at an approved Kronos Upgrade time clock at the crew base when reporting to work at the start of their tour of duty and must swipe out at an approved Kronos Upgrade time clock at the end of their tour of duty."  *Id.*  The letter continued, "[p]lease be advised that any employee who refuses to comply with the Kronos Upgrade as directed by MNR management will be subject to disciplinary action, up to and including dismissal."  *Id.*  The letter thus did not accept ACRE 1's proposal that implementation of the Kronos system be delayed until agreement was reached through negotiations.

Also on August 30, 2019, Sanzari emailed MNR a list of questions regarding the implementation of Kronos and the swiping requirements for conductors.  ACRE 1 representatives and MNR officers met on August 30, 2019 to discuss those questions.  *Id.* ¶ 25.

On September 3, 2019 (the eve of MNR's deadline for implementation of Kronos), ACRE 1 again met with MNR to discuss questions and concerns ACRE 1 had with respect to Kronos.  At that meeting, ACRE 1 hand-delivered a letter from their attorneys stating that ACRE

1 was willing to cooperate with the implementation of Kronos, but demanding to exercise their purported right to bargain about the position pursuant to Sections 2 and 6 of the RLA with regard to the changes that would purportedly affect the rules and working conditions governing ACRE 1 members.  *Id.* ¶ 27.

In the course of discussions and correspondence with ACRE 1, MNR did not change its position, and a letter from MNR on September 16, 2019, and further emails from Paul on September 3, 2019, and September 17, 2019, reiterated that MNR would unilaterally adopt Kronos effective September 18, 2019, and that employees would be subject to discipline for late or missed swipe ins and swipe outs.  *Id.* ¶¶ 29-32.

### C.  Plaintiff's claims

Plaintiff brings this lawsuit seeking injunctive relief to prevent MNR from unilaterally adopting and implementing the Kronos system until after the parties have engaged in the required bargaining pursuant to the RLA.

The Complaint asserts, *inter alia*, that:

> MNR's imminent implementation of the Kronos biometric finger scan time keeping system unilaterally alters established terms and conditions of employment of . . . [MNR] conductors, assistant conductors, yardmasters, and assistant stationmasters while RLA negotiations are continuing and without exhausting the mandatory mediation and status quo requirement of the RLA.  There is no term of the CBA that arguably permits such unilateral MNR action.

*Id.* ¶ 40.  It thus seeks to establish that by unilaterally implementing the Kronos system, MNR has violated the mandatory bargaining provisions of the RLA.

The Complaint also brings claims under New York labor law.  However, because those claims relate exclusively to the proposed fingerprint scanning policy of the Kronos system, they are deemed to be withdrawn on the basis of Plaintiff's representations at oral argument and are dismissed without prejudice.

## PROCEDURAL HISTORY

Plaintiff initiated this action by filing a complaint on September 18, 2019.  Dkt. No. 1.
The Amended Complaint was filed on December 23, 2019.  Dkt. No. 10.  Defendant filed the
instant motion on July 6, 2020, Plaintiff's opposition was filed July 20, 2020, and Defendant's
reply was filed July 27, 2020.  Dkt. Nos. 21, 29, 33.  The Court heard oral argument on January
28, 2021.

## LEGAL STANDARD

A court properly dismisses a claim for lack of subject matter jurisdiction under Rule
12(b)(1) when it "lacks the statutory or constitutional power to adjudicate it . . ."  *Cortlandt St.
Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015).  "A
plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the
evidence that it exists."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "A
motion to dismiss for lack of subject matter jurisdiction may 'raise a facial challenge based on
the pleadings, or a factual challenge based on extrinsic evidence.'"  *U.S. Airlines Pilots Ass'n ex
rel. Cleary v. US Airways, Inc.*, 859 F. Supp. 2d 283, 296 (E.D.N.Y. 2012) (quoting *Guadagno v.
Wallack Ader Levithan Assocs.*, 932 F. Supp. 94, 95 (S.D.N.Y.1996)).  Where the defendant
challenges the legal sufficiency of a complaint's allegations, the court must treat all factual
allegations as true and draw reasonable inferences in favor of the complaining party.  *Robinson
v. Gov't of Malay.*, 269 F.3d 133, 140 (2d Cir.2001).  However, where the jurisdictional
challenge is fact-based, the defendant may "proffer[] evidence beyond the [p]leading," and the
plaintiff "will need to come forward with evidence of their own to controvert that presented by
the defendant 'if the affidavits submitted on a 12(b) motion . . . reveal the existence of factual
problems' in the assertion of jurisdiction."  *Carter v. HealthPort Techs.*, LLC, 822 F.3d 47, 57
(2d Cir. 2016) (quoting *Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d

Cir.1976)).  In that case, "no presumptive truthfulness attaches to the complaint's jurisdictional allegations," and "the burden is on the plaintiff to satisfy the Court, as fact-finder, of the jurisdictional facts."  *Guadagno*, 932 F. Supp. at 95.

## DISCUSSION

Plaintiff alleges that MNR has violated the RLA by refusing to negotiate with it over the implementation of the two changes to CMS, represented by Kronos as it is currently planned, and by insisting on the right to implement those changes unilaterally.  It seeks injunctive relief under the RLA prohibiting MNR from adopting the two changes until the parties have mutually agreed on its implementation.  Its argument turns upon the provisions of the RLA and their application to the facts here.

### A.       The Railway Labor Act.

The RLA, 45 U.S.C. § 151 *et seq.*, describes two classes of labor disputes and sets forth different procedures for their resolution.

Section 2 (Seventh) of the RLA provides: No carrier "shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements" or through the mediation procedures established in Section 6 of the RLA.  45 U.S.C. § 152 (Seventh).  For this class of disputes, "the RLA requires the parties to undergo a lengthy process of bargaining and mediation. . . . Until they have exhausted those procedures, the parties are obligated to maintain the status quo, and the employer may not implement the contested change in rates of pay, rules, or working conditions." *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302-03 (1989) ("*Conrail*") (citing 45 U.S.C. §§ 155, 156).

Section 2 (Sixth) and Section 3 (First) address disputes arising or growing "out of grievances or out of the interpretation or application of agreements concerning rates of pay,

rules, or working conditions."  45 U.S.C. §§ 152, 153.  For this class of dispute, the RLA

requires the parties to engage in compulsory and binding arbitration before the National Railroad

Adjustment Board or before an adjustment board established by the employer and the unions

representing the employees ("Adjustment Board").  The Adjustment Board has exclusive

jurisdiction over such disputes and judicial review of the arbitral decision is limited.  Unlike

changes in the "rates of pay, rules, or working conditions" under Section 2 (Seventh), in the

event of a dispute concerning the "interpretation or application" of existing agreements, the

employer is not required by the RLA to maintain the status quo pending an Adjustment Board's

decision.  *See Conrail*, 491 U.S. at 304.

The courts have adopted the term "major" to describe disputes falling in the first

category.  *Id.* at 302.Disputes falling in the second category are considered to be "minor"

disputes.  *Id.*

The classification of a dispute as major or minor under the RLA is consequential.  If a

dispute is deemed to be one over a "change" to "the rates of pay, rules or working conditions of .

. . employees," the employer and the union must engage in the "traditional voluntary processes of

negotiation, mediation, voluntary arbitration, and conciliation."  *Brotherhood of Locomotive*

*Eng'rs Div. 269 v. Long Island R.R. Co.*, 85 F.3d 35, 37 (2d. Cir. 1996) (quoting *Elgin, J. & E.R.*

*Co. v. Burley*, 325 U.S. 711, 725 (1945)); *see* 45 U.S.C. §§ 151-158.  These processes "have

been described by the Supreme Court as 'almost interminable[,]'" *Air Line Pilots Ass'n Int'l v. E.*

*Air Lines, Inc.*, 863 F.2d 891, 895 (D.C. Cir. 1988) (quoting *Detroit & Toledo Shore Line R.R.*

*Co. v. United Transp. Union*, 396 U.S. 142, 148, (1969)), and indeed they are "purposely long

and drawn out, based on the hope that reason and practical considerations will provide in time an

agreement that resolves the dispute."  *Detroit & Toledo Shore Line R.R. Co.*, 396 U.S. at 148

(quotation omitted); *see also Atlas Air, Inc. v. Int'l Brotherhood of Teamsters*, 280 F. Supp. 3d 59, 68 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019) (describing each stage of the procedure for resolving "major" disputes under the RLA).  That is because "[f]ailure of the virtually endless process of negotiation and mediation established by the RLA for major disputes frees the parties to employ a broad range of economic self-help, which may disturb transportation services throughout the industry and unsettle employer-employee relationships." *Conrail*, 491 U.S. at 311 (internal citations omitted).  Because the employer may not implement a contested major change unilaterally, and "district courts have subject matter-jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury," *id.* at 303, a determination that a dispute falls within this category can delay—sometimes indefinitely—the implementation of the change.

If a dispute is deemed to be minor and to grow "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions," by contrast, "a court cannot assert jurisdiction over the action nor can the parties seek judicial remedies such as an injunction."  *Brotherhood of Locomotive Eng'rs*, 85 F.3d at 37; *see Conrail*, 491 U.S. at 304 (Adjustment Boards "[have] exclusive jurisdiction over minor disputes"); *Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.*, 789 F.2d 139, 141 (2d Cir.1986) (same). "The effect of [deeming a controversy to be minor is] to delay collective bargaining in some cases until the arbitration process is exhausted," during which time the contested policy will be in effect.  *Conrail*, 491 U.S. at 310.

The line between a change that is major and a dispute that is minor has been elusive.  The language "change [of] rates of pay, rules or working conditions of its employees" and "interpretation or application of agreements concerning rates of pay, rules, or working

conditions" is not self-defining.  *Conrail*, 491 U.S. at 307 (noting difficulty of resolving "concrete cases" with "abstract words").  "[T]he formal demarcation between major and minor disputes does not turn on a case-by-case determination of the importance of the issue presented or the likelihood that it would prompt the exercise of economic self-help."  *Id.* at 305.  Nor does it turn entirely on pleading.  The law does not "lea[ve] the characterization of the dispute solely in the hands of one party."  *Id.* at 306.

Rather, the classification of a dispute as major or minor turns on the nature of the action or change sought to be made by the employer and whether "a claim has been made [by that party] that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action."  *Id.* at 305.  It is also animated by the underlying policy "of the RLA is to prevent service interruptions in the transportation industries by encouraging labor peace and avoiding strikes."  *Atlas Air, Inc. v. Int'l Brotherhood of Teamsters*, 943 F.3d 568, 573 (2d Cir. 2019) (citing *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248 (1994)); *see* also *Int'l Ass'n of Machinists, AFL-CIO v. Cent. Airlines, Inc.*, 372 U.S. 682, 687 (1963) ("Congress has long concerned itself with minimizing interruptions in the Nation's transportation services by strikes and labor disputes.").

Since the Supreme Court's decision in *Elgin,* courts have classified a "major" dispute as one that concerns:

> the formation of collective agreements or efforts to secure them.  They arise where there is no such greater agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy.

*Elgin*, 325 U.S. at 722.  A minor dispute, in contrast:

contemplates the existence of a collective agreement already concluded or . . . a situation in which no effort is made to bring about a formal change in terms . . . [and] relates either to the meaning or proper application of a particular provision.

*Id.*; *see Brotherhood. of Locomotive Eng'rs Div. 269*, 85 F.3d at 37 (2d Cir. 1996) (*Elgin*, 325 U.S. at 722). In other words, "major disputes seek to create contractual rights, minor disputes to enforce them." *Conrail*, 491 U.S. at 302 (1989) (citing *Elgin*, 325 U.S. at 723 (1945)).

In *Conrail*, the Supreme Court further articulated the basis for differentiating between major and minor disputes. It provided:

> [I]f an employer asserts a claim that the parties' agreement gives the employer the discretion to make a particular change in working conditions without prior negotiation, and if that claim is arguably justified by the terms of the parties' agreement (i.e., the claim is neither obviously insubstantial or frivolous, nor made in bad faith), the employer may make the change and the courts must defer to the arbitral jurisdiction of the Board.

491 U.S. at 310. "The Court noted that this standard reflects "the '*relatively light burden* which the railroad must bear' in establishing exclusive arbitral jurisdiction under the RLA." *Brotherhood of Locomotive Eng'rs*, 85 F.3d at 38 (quoting *Conrail*, 491 U.S. at 307) (emphasis added in *Brotherhood of Locomotive Engineers*). Thus, to find a major question, "[i]n essence, the court must conclude that any reasonable trier of fact would find virtually as a matter of law that the employer has violated the contract." *Ass'n of Flight Attendants, AFL-CIO v. United Airlines., Inc.*, 976 F.2d 102, 105 (2d Cir. 1992).

Moreover, while "[i]n cases where a carrier contends that a given controversy is a 'minor' dispute, courts have typically looked to the pertinent collective bargaining agreements to determine whether a plausible interpretation would justify the carrier's action," *CSX Transp., Inc. v. United Transp. Union*, 879 F.2d 990, 997 (2d Cir. 1989), the classification of a dispute as major or minor does not turn upon the four corners of the collective bargaining agreement alone. A collective bargaining agreement is not a bond indenture. The Supreme Court has held that

"collective-bargaining agreements may include implied, as well as express, terms," and "it is well established that the parties' 'practice, usage and custom' is of significance in interpreting their agreement." *Conrail*, 491 U.S. at 311 (quoting *Transp.-Commc'n Emps. Union v. Union Pac. R. Co.*, 385 U.S. 157, 161 (1966)).  Moreover, as the Supreme Court has observed:

> A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. . . . [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate . . . The collective agreement covers the whole employment relationship. It calls into being a new common law— the common law of a particular industry or of a particular plant.

*Id*. at 311-12 (quoting *Union Pac. R. Co.*, 385 U.S. at 160-61); *see id*. at 318 ("labor laws do not require all the details of particular practices to be worked out in advance"); *see also Long Island R. Co. v. Int'l Ass'n of Machinists*, 874 F.2d 901, 909 (2d Cir. 1989) (noting the district court's consideration of "incidents of employment," such as "arbitration awards, operating rules and attendance policies" in deciding whether a dispute was "major" or "minor").

Thus, the Second Circuit has held that in order to meet *Conrail's* "arguably justified test," "an employer need demonstrate only that a reasonable trier of fact could adopt the employer's view of the contract." *Brotherhood of Locomotive Eng'rs*, 85 F.3d at 38 (quoting *Ass'n. of Flight Attendants*, 976 F.2d at 105).  To find that a dispute is "major," it is not enough for a court to conclude a party challenging an employer's action "will likely succeed on the merits" as to whether the operative agreement permits the action.  *Ass'n of Flight Attendants*, 976 F.2d at 104.  Rather, "[i]n essence, the court must conclude that any reasonable trier of fact would find virtually as a matter of law that the employer has violated the contract."  *Id*. at 105.

### B.    Application of the standard

The resolution of whether the dispute between ACRE 1 (via Sanzari) and MNR is "major" or "minor" for purposes of the RLA turns upon both the language of the CBAs as well

as on the parties' "practice, usage and custom." *Conrail*, 491 U.S. at 311.  As stated above, the two aspects of the Kronos system that Plaintiff seeks to challenge are (1) the requirement that employees clock off at the end of their shift, as opposed to retaining the option to log the time their shift ends at the start of their next shift, and (2) the policy that employees who do not comply with Kronos will be subject to discipline, including for failing to clock on or off at the appropriate time.

### 1.      The relevant provisions and historical practice

Defendant points to provisions in both the Conductor CBA and the Yardmaster CBA that it asserts evidence its "contractual authority to establish or change reporting procedures."  Dkt. No. 22 at 8.  In particular, Defendants highlight Rule 50 of the Conductor CBA and Rule 1 of the Yardmaster CBA.

Rule 50 of the Conductor CBA, entitled "Starting Times," comprises subsections (a) through (h).  Subsection (a) provides that "[r]egularly assigned employees engaged in switching and classification service will each have a fixed starting time which will not be changed without at least forty-eight (48) hours' advance notice."  Dkt. No. 23-2 at 87.  Subsections (b) through (e) prescribe ranges of permissible start times for work shifts, depending on how many shifts are worked in "continuous service."  *Id*.  For example, Section (b) of Rule 50 states "b. Where three (3) eight (8) hour shifts are worked in continuous service, the time for an assignment on the first shift to begin work will be between 6:00 a.m. and 10:00 a.m., the second shift, 2:00 p.m. and 6:00 p.m., and the third shift, 10:00 p.m. and 2:00 a.m."  *Id*.  Subsection (h) provides, "[i]f an employee is started at a time other than provided for in paragraph 'b' or 'd', he will be paid from the last permissible starting time until released from duty."  *Id*.

In addition to Rule 50, other provisions of the Conductor CBA contemplate benefits and requirements that are keyed to the number of hours an employee works.  For example, Rule 2,

entitled "Classifications and Basis of Pay" establishes hourly rates of pay, including a time and one-half rate of pay for "all time in excess of eight (8) hours on duty between the time [an employee] is required to report for duty until the time they are finally released on completion of services . . ." *Id.* at 2.

Rule 1 of the Yardmaster CBA, entitled "Work Week," contains two sections.  It provides, in full:

> (a) The work-week for regularly assigned, full-time employees shall be forty (40) hours, consisting of any five (5) days of eight (8) hours work.  The starting time and quitting time of assignments or shifts will be established by the Carrier, except that no shift may be scheduled to start between midnight and 6 a.m., unless such scheduling is agreed to by the General Chairman and the Carrier.

> (b) Where the nature of work to be performed is intermittent, assignments may be established requiring employees to work eight (8) hours within a spread of not more than ten (10) hours.  The Carrier may schedule not more than two (2) periods of work, for example, of four (4) hours each, with one (1) period of time in which the employees will not be working, for example of two (2) hours.  For such assignments, employees will be paid at the straight time rate, not overtime rate, for periods of work, and at a rate equal to fifty percent (50%) of the applicable straight time rate for the period in which they are not working.

Dkt. No. 23-4.

Defendants argue that these provisions which set the hours of work and require MNR to pay employees based on those hours at least arguably contain the implied term that permits MNR to adopt a system to track the hours an employee works, including the start and end times.  For his part, Plaintiff focuses on the fact that neither the Conductor CBA nor the Yardmaster CBA expressly or impliedly permits MNR to implement the challenged policies.  Plaintiff argues that MNR is therefore seeking "to change the terms" of the CBAs, *Elgin*, 325 U.S. at 722, and thereby to change the "rates of pay, rules or working conditions," of ACRE 1 members, *id*. at 739, implicating the mandatory bargaining provisions of the RLA.

Each party also takes a different message from the evidence of practice, custom, and usage.  In or about 1997, MNR announced that it would be implementing the CMS for passenger service.  Bottalico Aff.  ¶ 13.  At the time, CMS was utilized by freight railroads but it had to be modified to reflect the work rules and procedures particular to passenger service and to adhere to the provisions of the collective bargaining agreement.  *Id.*  Plaintiff offers a declaration that, at the time, it did not acquiesce to MNR's ability unilaterally to implement that system but wrote a "non-acquiescence" letter to MNR asserting the unions'[1] position that the creation and implementation was a change in the work agreement that had to be negotiated, and that MNR would be in violation of the RLA if it were to unilaterally implement CMS.  However, it does not offer the letter itself.  Bottalico Aff.  ¶¶ 2, 9.  Between 1997 and January 1998, a Steering Committee which included representatives from MNR and the unions met and discussed the implementation of CMS.  A representative of the union has submitted a declaration that the Steering Committee "negotiate[d] the terms of the CMS implementation."  *Id.*  Defendants point to a letter sent by MNR on January 30, 1998 to the then-chairmen of the unions that preceded ACRE 1, in which MNR states that it made the determination that it was "in Metro-North's best interest to require that all employees 'key in' to the CMS computer terminal at the beginning of each assignment during their initial 'on duty' time" and that MNR has decided that employees may "key out" either at the end of their tour of duty or when they "key in" for their next shift.  Dkt. No. 23-5.  Although the letter expresses "great[] appreciat[ion]" for the "participation" of the union on the Steering Committee and states "[w]e look forward to your continued suggestions, participation, and cooperation throughout the implementation of the CMS Project,"

---

[1] At the time, MNR employees were represented not by ACRE I but by two unions that preceded it.

*id.* at 2, it makes clear that the ultimate decisions regarding the CMS system were made by MNR alone: "In making this determination, *we* have taken into consideration all of the various viewpoints expressed by the members of the Steering Committee." *Id.* at 3 (emphasis added). Plaintiff offers no evidence that the union disputed the characterization of the resolution of CMS at the time.

On January 13, 1999, MNR wrote to union representatives regarding the "resolution of outstanding issues related to the Crew Management System." Dkt. No. 23-6 at 2. The opening sentence of the letter states that it is describing the "result of our continued Grievance Mediation discussions." *Id.* The letter then describes the resolution of a number of grievances regarding how the hours of work and reporting times will be determined and includes with respect to the "Crew Management System" generally:

> The BLE and UTU fully support the implementation of the Crew Management System and will cooperate in all reasonable steps necessary to implement this system. Union and Metro-North officials will continue to meet after the system is put into place to discuss and resolve issues. Other than claims for shortages or miscalculations in payments, the UTU and BLE will not file any grievances regarding the implementation of the Crew Management System.

*Id.* at 3.

The 1999 letter is attached as an exhibit to the Conductor CBA. *See* Dkt. No. 23-3 at 176. Plaintiff points out that the grievance mediation described in the 1999 letter is not the same as the grievance process outlined in the CBA. Bottalico Aff. ¶ 18. The mediation was conducted pursuant to a letter agreement in which each side preserves (and does not waive) its rights, thus not requiring the parties to argue whether any dispute is major or minor.

At oral argument in this case, Plaintiff sought to draw from this record evidence of a consistent pattern of practice that gave rise to an implied contractual term that MNR would not unilaterally change the CMS system as it was implemented in 1999. It also argues that because it

did not acquiesce to the 1999 adoption of CMS as being a minor dispute within the existing CBA, it should not be understood to have agreed that MNR retained the right to change the CMS. For their part, Defendant points to the evidence that the 1999 change was not collectively bargained but was unilaterally adopted by MNR (albeit after discussion with the union) and that discussions regarding changes to and implementation of the CMS after 1999 were conducted through the grievance process. It contends that any additional changes it now makes to the reporting and crew management systems also are within its authority under its agreements with the union.

### 2.      Resolution of the dispute

MNR has met its burden that implementation of the Kronos system is "arguably justified" by the Conductor CBA and the Yardmaster CBA. The contractual provisions address the duration of work shifts, specifically contemplate the existence of eight-hour shifts, and contemplate that MNR will compensate employees based on the hours worked. For at least two reasons, it is at least arguably implicit that MNR retained the unilateral right to make the changes to the CMS at issue here.

First, as the Supreme Court has repeatedly made clear, "[a] collective bargaining agreement is not an ordinary contract . . . it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *See Conrail*, 491 U.S. at 311-312. One of those cases that a draftsman could not wholly anticipate but that arguably would at least be implicit in the collective bargaining agreement is that management would need a system to measure and determine when employees began and ended their shifts and that those systems would change with changes in technology. There is no evidence whatsoever before the Court that the parties intended by the collective bargaining agreement to freeze in place all of the terms of the existing crew management system unless and until the union agreed to the changes through collective

bargaining or as a result of the purposefully long and drawn out process of negotiation and mediation or management prevailed through the exercise by each side of economic self-help. *See id*. at 318 ("labor laws do not require all the details of particular practices to be worked out in advance.").

Moreover, as a matter of contract law, and even leaving aside that a CBA is interpreted as a code of conduct, "[t]hat a particular provision has not been expressly stated in a contract does not necessarily mean that no such covenant exists." *Rowe v. Great Atl. & Pac. Tea Co.*, 412 N.Y.S.2d 827, 831 (1978). Rather, "the undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id*. (citing 5 Williston, Contracts [rev. ed., 1937], § 1293). In this case, MNR has at the very least made an "arguably justified" claim its discretion to create a timekeeping system for monitoring the duration of work shifts is implicit in an agreement that contemplates that shifts will be of a specific duration and under which its obligation to pay wages is dependent on the number of hours each employee works. *Id*. at 310. It is similarly arguably implicit that an employer possesses the power to impose discipline on employees who violate company policies, such as those about timekeeping.

The pattern of practice does not do for Plaintiff what Plaintiff would need it to do— namely, establish evidence that the modifications MNR would make to the crew management system constitute a "change [in] the rates of pay, rules, or working conditions of its employees." 45 U.S.C. § 152 (Seventh). In particular, the evidence does not establish that MNR established such a consistent and invariable practice over time that the practice must be understood to have frozen in place and made any change in the practice in essence a clear breach of contract. *Ass'n of Flight Attendants*, 976 F.2d at 105; *see id*. at 105 n.2 (in a dispute over an airline's practice in

designating new foreign domiciles for flight attendants, its policy with respect to the opening of one prior such domicile "hardly establish[ed] an industrial practice governing all future foreign domiciles"). As the Seventh Circuit has explained, it is not enough that a practice constitutes a "mere regularit[y]," but rather only "[p]ractices *accompanied by assurances of continuation, express or implied but in either event likely to induce reliance, can create an implied obligation.*" *Chi. & N. W. Transp. Co. v. Ry. Labor Execs.' Ass'n*, 908 F.2d 144, 154 (7th Cir. 1990) (citing *Conrail*, 491 U.S. at 311) (collecting cases) (emphasis added). The evidence here shows that at least MNR believed that it had in 1998 and retained thereafter the right to make changes to the crew management system in response to changes in technology and the needs of MNR. Whether or not the union acquiesced to unilateral implementation of the old crew management system, and regardless of whether its views on implementation of the system were heard and considered through the Steering Committee, the union cannot by its non-acquiescence make what from the collective bargaining agreements are minor disputes into major disputes.

The Court emphasizes that the instant case bears a similarity to *Conrail* itself, although *Conrail* involved implementation of a more substantial change in company policy than is at issue here. There, the defendant-railroad ("Conrail") unilaterally implemented a urinalysis drug screening program that was patently different (and more intrusive) than the policy that preceded it. *See Conrail*, 491 U.S. at 312-15. Defendant proffered no contractual term in the applicable bargaining agreement that expressly permitted Conrail to change the policy—or even to implement a drug screening policy at all (the agreement was even in the record). *See id*. at 311. However, because there was no "established rule" between the parties that Conrail could not implement drug screening in the manner and for the purpose it sought to, *id*. at 317, and because Conrail's claim that it retained discretion to establish drug testing procedures was supported by a

history of Conrail unilaterally setting such procedures, the dispute over the policy represented a minor question fit for arbitration.

In this case, by contrast, MNR's right to make the modifications at issue finds some support in the text of the CBAs themselves and nothing in the CBAs prohibits unilateral implementation of the contested policies.  Contrary to Plaintiff's argument, the 1998 and 1999 letters reflect, if anything, the type of unilateral policy-setting that in *Conrail* supported a finding of employer discretion.  The mere fact that MNR created a steering committee to negotiate the implementation of CMS falls far short of establishing that MNR's argument that it is not contractually barred from changing that policy is "obviously insubstantial or frivolous."  *Conrail*, 491 U.S. at 310.

The Court stresses that it is not now deciding which party will ultimately prevail on the merits as to whether the contested policies are permitted by the CBAs.  It has only decided that MNR has easily carried its "relatively light burden" to make an "arguably justified" claim that implementation of the policies at issue are within its discretion under the CBAs.  *Conrail*, 491 U.S. at 307, 310.  Thus, in this circumstance, referring the issue to an Adjustment Board will serve the purpose of the RLA to ensure that the parties "maintain agreements," by "assuring that collective-bargaining contracts are enforced by arbitrators who are experts in 'the common law of [the] particular industry.'"  *Conrail*, 491 U.S. at 310 (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 580 (1960)).

## CONCLUSION

As to Plaintiff's first and second causes of action, because the question presented in this case is a minor one, the Court lacks subject matter jurisdiction and those claims are DISMISSED without prejudice.

Because Plaintiff's third and final cause of action (listed in the Complaint as "1s [sic] supplemental claim," AC at 12, relates solely to implementation a fingerprint scanning policy which has been indefinitely suspended, and as to which Plaintiff has withdrawn its claims, that claim is also DISMISSED without prejudice.

The Clerk of Court is respectfully directed to terminate all pending motions and close the case.

SO ORDERED.

Dated: February 9, 2021
      New York, New York                    _____
                                                    LEWIS J. LIMAN
                                               United States District Judge